**ACTION ALLIANCE FOR SENIOR CITIZENS OF GREATER PHILADELPHIA, an unincorporated association, by Frank Bradley, President, et al., Plaintiffs,**

v.

**Milton J. SHAPP et al., Defendants.**

**Civ. A. No. 74–1612.**

United States District Court,
E. D. Pennsylvania.

July 30, 1975.

As Amended Jan. 30, 1976.

---

9. 371 U.S. at 491, 83 S.Ct. at 419.

10. 342 F.Supp. at 1361.

11. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

**1210**

Douglas G. Dye, Jonathan M. Stein, Philadelphia, Pa., for plaintiffs.

Lawrence Silver, Norma P. D'Apolito, Deputy Attys. Gen., Commonwealth of Pa., Harrisburg, Pa., for defendants.

Before ADAMS, Circuit Judge, and HUYETT, and GREEN, District Judges.

### MEMORANDUM

HUYETT, District Judge.

Invoking 28 U.S.C. section 1343 (3) and (4) as well as 42 U.S.C. section 1983, 28 U.S.C. sections 2201 and 2202, and Fed.R.Civ.P. 57, plaintiffs, both organizational and individual plaintiffs, bring this action [1] for declaratory and injunctve relief challenging the constitutionality of the Pennsylvania Senior Citizens Property Tax Assistance Act [2] (the Act). Plaintiffs contend that section 4751–4(d) [3] of the Act offends both the equal protection and due process clauses of the Fourteenth Amendment to the Constitution because it impermissibly excludes from benefits renters who receive public assistance from the Pennsylvania Department of Public Welfare.[4] The individual plaintiffs in this action, Helen Melso, Ernest McRae, Kathryn Mecredy, and Ruth Thompson, all filed claims under the Act for 1972

and 1973 benefits and, although otherwise eligible, were denied all or a part of their claims because they were renters receiving public assistance from the Department of Public Welfare. The organizational plaintiffs, Action Alliance for Senior Citizens of Greater Philadelphia and the Philadelphia Welfare Rights Organization, are both groups which have as their members renters who are ineligible for benefits under the Act because of their receipt of public assistance. Defendant Milton J. Shapp is the Governor of Pennsylvania; defendant George J. Mowod is the Secretary of the Pennsylvania Department of Revenue; defendant Stanley Weiss, Jr., is the Director of the Property Tax Assistance Bureau; and defendant Paul Standeven is the Administrator of the Philadelphia Office of the Pennsylvania Department of Revenue. All defendants are state officers charged in various ways with administering and implementing the Act.

### I. The Act

The Senior Citizens Property Tax Assistance Act, as originally enacted,[5] provided property tax assistance to low-income homeowners who were either sixty-five years old or older, widows

---

1. Plaintiffs filed this action as a class action and timely moved for certification of a class identified as "all Pennsylvania renters who, during the years 1972 and 1973 or in the future, received or will receive public assistance from the Pennsylvania Department of Public Welfare." Because of the standing issues and the challenge to the adequacy of class counsel's representation, *see* note 19 *infra*, we delayed our determination on class certification until trial. Having waited this long and because we have confidence in the strong precedential value of a decision by a three-judge court, we see no purpose in certifying a class now, and we will not do so.

2. 72 P.S. section 4751–1 *et seq.*, as amended.

3. The relevant section of 4751–4(d) reads:
 A claimant who is a renter shall not be eligible for rent assistance in lieu of property taxes during those months within which he receives public assistance from the Department of Public Welfare.

4. Subsequent to the filing of the complaint in this action, a three-judge court was convened pursuant to 28 U.S.C. sections 2281 and 2284. By the Order of the three-judge court dated August 1, 1974 (Adams, J., dissenting), we granted plaintiffs' motion for a temporary restraining order under which we ordered the state, in the alternative, to cease all payments under the Act, set aside a reserve fund of $10,000,000 out of the State Lottery Fund for payment of claims should plaintiffs succeed on the merits, or assure this Court that sufficient funds would be available in the event plaintiffs were successful. On August 13, 1974, we received an affidavit from Vincent X. Yakowicz, then Secretary of the Pennsylvania Department of Revenue, giving the assurance required by alternative three.

5. Act of March 11, 1971 P.L. 104, No. 3.

fifty years old or older, or permanently disabled. In December 1973 the Act was amended to extend rent assistance in lieu of property tax assistance to renters.[6] Moreover, renters were permitted to file during the 1974 filing period for both 1973 benefits and, retroactively, for 1972 benefits. The statement of legislative policy preceding the substantive sections of the amended Act declares:

> In recognition of the severe economic plight of certain senior citizens, widows, widowers and permanently disabled persons who are real property owners or renters with fixed and limited incomes who are faced with rising living costs and constantly increasing tax burdens upon their homesteads, the General Assembly, pursuant to the mandates of the Constitutional Convention of 1968, considers it to be a matter of sound public policy to make special provisions for property tax assistance or rent assistance in lieu of property taxes to that class of senior citizens, widows, widowers and permanently disabled persons who are real property taxpayers or renters who are without adequate means of support to enable them to remain in peaceable possession of their homes and relieving their economic burden.[7]

This present version of the Act does, however, expressly exclude from benefits any renter during any month that he or she receives public assistance from the Pennsylvania Department of Public Welfare;[8] homeowners on public assistance are not so excluded. Further, as interpreted by the Property Tax Assistance Bureau, which administers the Act, renters are excluded during the months they receive public assistance whether the assistance received is a partial or a full grant.[9] Effective January 1975 the Bureau will no longer consider renters who receive government subsidy only in the form of Supplemental Security Income (S.S.I.)[10] as receiving public assistance from the Department of Public Welfare, and these people will, therefore, be eligible for rent assistance under the Act.

For those eligible, the Act provides up to $200 a year in rent or property tax assistance, the amount any particular claimant receives depending on his or her yearly household income and the annual amount paid for rent or property tax.[11] According to the terms of the Act, the State Lottery Fund is the source of payment both of approved claims and the costs of administering the Act.[12]

6. The coverage of the Act was also extended to widowers.

7. 72 P.S. section 4751–2.

8. See note 3 supra for the statutory language.

9. Deposition of Stanley M. Weiss, Jr., Director of the Property Tax Assistance Bureau, at 28–30.

10. Amended Property Tax Assistance Regulations as promulgated, 4 Pa.Bull. 2614 (Dec. 21, 1974) and adopted, 5 Pa.Bull. 284 (Jan. 30, 1975). Section 105.4(a) of the new regulations reads in part:
 For the calendar year 1974 and thereafter, the receipt of Supplemental Security Income payments (S.S.I.) will not preclude a renter from receiving rent assistance in lieu of property taxes, even though the renter had previously received public as-

sistance from the Department of Public Welfare.
 Supplemental Security Income payments made to eligible persons over sixty-five (eligibility depends in part on need) and to permanently disabled persons are jointly funded by the state and federal governments. The checks to claimants, however, come from the United States Social Security Administration.

11. 72 P.S. section 4751–4(a), (a.1), and (b).

12. 72 P.S. section 4751–8 reads:
 Expenses, salaries and other costs incurred in the administration of this act and approved claims shall be paid from the State Lottery Fund established by the act of August 26, 1971 (P.L. 351, No. 91), known as the "State Lottery Law." In the event that the total amount of administrative expenses and claims exceeds the amount

## II. Threshold Issues

■ Defendants raise a variety of threshold challenges to the validity of this action. Of these challenges the two most substantial are to the capacity of the organizational plaintiffs to bring this lawsuit and the standing of all plaintiffs to maintain it.

First defendants contend that organizational plaintiffs, Action Alliance and Philadelphia Welfare Rights Organization (PWRO), because of their status as unincorporated associations, lack capacity to sue under both Pennsylvania law and Fed.R.Civ.P. 17(b)(1). Thus they challenge the very ability of organizational plaintiffs to bring this action, their right to get past the courthouse door so to speak. We find it unnecessary to determine whether or not plaintiffs have capacity to sue under Pennsylvania law[13] since we find that Rule 17 (b)(1) clearly confers capacity on both organizations to bring this particular

action. Rule 17(b)(1) confers capacity on an unincorporated association to "sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States . . . ." Defendants read this language very narrowly to confer capacity only in those instances where the substantive right asserted belongs to the unincorporated association as an entity and not to its individual members. As we understand defendants' argument, this would limit the capacity to sue granted unincorporated associations by Rule 17(b)(1) to the rare case in which, for example, the challenge was to the government's taking without compensation property held in the name of the association itself. The cases defendants cite in their trial brief in support of this narrow reading are unpersuasive,[14] and we do not believe Rule 17(b)(1) can be read as narrowly as defendants would have us read it.[15]

found in such fund, in any one year, then the percentage allowed as tax or rent assistance shall be reduced in the proportion that the amount of such fund bears to the total amount of claims in such year.

Consistently with this section, defendants have maintained that should the lottery fund in a given year be insufficient for any reason to pay all valid claims, the state would be forced to prorate payments. Plaintiffs point out the apparent conflict with this position created by section 3761–12 of the State Lottery Law, 72 P.S. 3761–1 et seq., which reads in part:

In the event sufficient funds are not available from the lottery receipts to meet the requirements of the act of March 11, 1971 (P.L. 104), known as the "Senior Citizens Property Tax Assistance Act," . . . additional funds to fulfill these obligations, shall be appropriated from the General Fund for this purpose.

Because of our disposition of this action, we need not address the questions posed by this conflict as they relate to the Eleventh Amendment to the Constitution.

13. Fed.R.Civ.P. 17(b) reads in part:
In all other cases [excepting individuals and corporations] capacity to sue or be sued shall be determined by the law of the state in which the district court is held, . . .

14. *Carroll v. Associated Musicians of Greater New York*, 206 F.Supp. 462 (S.D.N.Y.1962), aff'd. 316 F.2d 574 (2d Cir. 1963), and *Associated Orchestra Leaders v. Philadelphia Musical Society*, 203 F.Supp. 755 (E.D.Pa. 1962), are older standing cases. In *Rock Drilling v. Mason & Hanger Co.*, 217 F.2d 687 (2d Cir. 1954), cert. denied, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955), a case in which a labor union attempted to bring a tort action against a union official and employers, the court found among other things that there was no federal question. Therefore there was no possibility of the court's finding capacity under Rule 17(b)(1) although it did not explicitly address the issue. Although it is unclear in *Nassau County Association v. Aetna Casualty & Surety Co.*, 345 F.Supp. 645 (S.D.N.Y.1972), whether the court dismissed the complaint for lack of capacity or lack of standing, the court does not mention Rule 17(b)(1) and it emphasizes the strict jurisdictional requirements of antitrust litigation.

15. In both *Council No. 34, American Federation of State, County, and Municipal Employees, AFL–CIO v. Ogilvie*, 465 F.2d 221 (7th Cir. 1972), and *Alston v. School Board City of Norfolk*, 112 F.2d 992 (4th Cir.) cert. denied, 311 U.S. 693, 61 S.Ct. 75, 85 L.Ed. 448 (1940), the courts explicitly invoked Rule 17(b)(1) in finding that unincorporated associations have capacity to sue

■ Second defendants urge that for various reasons none of the plaintiffs have standing to maintain this action. Beginning with individual plaintiffs Melso, McRae, and Mecredy, defendants argue, in a two-step analysis, that all three plaintiffs lack standing. First defendants contend that plaintiffs' claim for prospective relief is moot because, in the case of plaintiff Melso, she no longer receives any form of public assistance; in the cases of plaintiffs McRae and Mecredy, the only assistance received is in the form of S.S.I., and, under the new regulations promulgated by the Bureau of Tax Assistance, both plaintiffs are now eligible for benefits under the Act. Next defendants contend that under *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), these plaintiffs are not entitled to retroactive benefits.[16] Putting these two steps together, defendants conclude that plaintiffs are without standing to sue. Mootness and standing are separate concepts, of course; more tellingly, however, defendants' argument confuses lack of standing with a state's possible defense to a plaintiff's request for retroactive monetary relief. We find that these plaintiffs had standing at the time suit was filed.

■ As to the remaining individual plaintiff, Ruth Thompson, defendants maintain that she lacks standing because she is ineligible for benefits under the Act for a reason other than her receipt of public assistance, that is, she has not established her widowhood under Pennsylvania law although she has not heard from her husband in thirty years. A review of the Pennsylvania cases cited by both plaintiffs and defendants[17] suggests that a factfinder could go either way in deciding whether or not Mrs. Thompson is entitled to a presumption of her husband's death. However this may be, she has apparently never been notified by the Bureau of Tax Assistance that she is not a widow for the purposes of the Act nor has the Bureau challenged her assertion of widowhood in any way. Under these circumstances we find plaintiff Thompson has standing to sue.

■ Moving to the organizational plaintiffs, defendants question the standing to sue of PWRO on the ground that plaintiff was able to place in the record the names of only six members, out of a total of 3500 members, who would be eligible for benefits under the Act except that they are renters on public assistance. Although we might feel more confident of PWRO's taking a vigorous, adversarial stance had plaintiff been able to identify more members adversely affected by the Act, we nonetheless find that plaintiff has sufficiently alleged injury to its members to attain standing under the doctrine of

---

to enforce federal rights of their members. In *Ogilvie* the Court of Appeals for the Seventh Circuit upheld the capacity of an unincorporated labor union to sue to enjoin state officials from requiring financial disclosures from certain of its members; in *Alston* the Court of Appeals for the Fourth Circuit upheld the capacity of an unincorporated teachers' association to sue to vindicate the rights of its members to equal salaries. We also note that while capacity to sue was not an issue in *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), SCRAP itself is an unincorporated association. 412 U.S. at 678, 93 S.Ct. 2405.

16. Although plaintiffs dispute defendants' characterization of part of the relief they request as "retroactive," they do ask that

any injunction we issue include an order to defendants

> to reopen for ninety (90) days the period tor filing for rent assistance under the said Act for calendar year 1972 and 1973 and during such ninety (90) day period to regularly publish via radio, television, and newspapers of general circulation in the Commonwealth, an announcement that persons formerly ineligible because of receipt of public assistance from the Department of Public Welfare may now be eligible for rent assistance in lieu of property taxes and should apply therefor; . . . .

17. *See, e. g., Maley v. Pennsylvania Railroad Co.*, 258 Pa. 73, 101 A. 911 (1917), and *Grunda v. First Lithuanian Building and Loan Association*, 128 Pa.Super. 604, 194 A.2d 747 (1937).

*United States v. SCRAP*, 412 U.S. 669 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).[18]

 Last defendants contend that plaintiff Action Alliance, composed of over two hundred member organizations, has no standing because of its status as an umbrella organization or organization of organizations. Because its members are organizations and not people, the argument goes, it has no standing to allege injury to the members of an organization which is, in turn, a member of Action Alliance. Since defendants do not seriously dispute that there exists at the grass roots membership tier a substantial number of people denied benefits under the Act because of their receipt of public assistance, we are persuaded by Judge Merhige in *Campaign Clean Water, Inc. v. Ruckelshaus,* 361 F.Supp. 689, 693 (E.D.Va.) *modified on other grounds sub nom. Campaign Clean Water, Inc. v. Train,* 489 F.2d 492 (4th Cir. 1973), *vacated on other grounds,* 420 U.S. 136, 95 S.Ct. 847, 43 L.Ed.2d 82 (1975) that:

> The fact that the groups representing the individuals injured rather than the individuals themselves are the actual

members of Campaign Clean Water is unimportant, since it is the interests of the individual persons that plaintiff ultimately represents.

We find that Action Alliance has standing to bring this action.[19]

### III. Equal Protection.

#### A. Standard of Review

██ Although plaintiffs do not ask us to apply to their equal protection claims the strict scrutiny applied in cases in which a so-called suspect class or fundamental right is present, they do ask that we apply a mediumly-heightened level of scrutiny, one arguably evolving from such cases as *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), *Weber v. Aetna Casualty and Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), and *James v. Strange,* 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972).[20] At the risk of oversimplifying, we note that in each of these cases, the Supreme Court found present discrimination against a class of persons possessing many, and possibly all, of the traditional attributes of a

---

18. This allegation of injury to plaintiff's members distinguishes plaintiff's pleadings from those of plaintiff Sierra Club in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In that case the Supreme Court held that plaintiff lacked standing to bring suit because

> Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents.

405 U.S. at 735, 92 S.Ct. at 1366. Conversely, the Court found that "[i]t is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." *Id.* at 739, 92 S.Ct. at 1368.

19. In addition to their challenges to capacity and standing, defendants also urge that because of improper activity in soliciting clients

by plaintiffs' attorneys, all members of Community Legal Services (CLS), there exists no real case or controversy in this action or, alternately, that CLS cannot provide proper class counsel. We find no merit in this contention.

Finally, defendants, having been rendered two previous decisions on the issue, raise again the contention that venue is improper in the Eastern District of Pennsylvania. We once more reject this contention, finding that venue is proper both under 28 U.S.C. section 1391(b) in that the claim arose here and under section 1392(a) in that one of the defendants, Paul Standeven, resides here.

20. In *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), Justice Blackmun apparently recognizes this third level of scrutiny. In stating the Court's holding Justice Blackmun writes:

> We therefore conclude that under any test—compelling state interest, or rational basis, or something in between—§ 15-2-1, in the context of child support, does not survive an equal protection attack.

suspect class.[21] In *Reed* the discrimination was based on sex, in *Weber* on illegitimacy, in *James* on indigency. Further it would appear that in reviewing the challenged discrimination against these "almost suspect" classes, the Court indeed applied a scrutiny measurably stepped-up from the ordinary rational basis scrutiny. We do not find on the record before us, however, any classification, either apparent or veiled, which isolates an "almost suspect" class. Although plaintiffs are persons on low, and perhaps even minimal, income, there is no classification under the Act based on wealth in the sense that plaintiffs are denied an important service or benefit because they cannot afford to pay for it.[22] Rather the Act under attack here represents an attempt to distribute a limited amount of state money to certain low income persons, and, unfortunately, the distribution does not reach all of the great number of people living near, at, and even below a subsistence level. This type of legislation we find to be relatively straightforward socioeconomic legislation which we cannot disturb unless the classifications it creates simply lack a rational basis.

B. Rationality of Classifications under the Act

■ In their trial brief plaintiffs concentrate on two sets of classifications under the Act[23] which they contend violate the equal protection clause of the Fourteenth Amendment. Plaintiffs argue that these classifications violate their right to equal protection of the law whether this court applies a middle or low level of scrutiny in reviewing the Act. The first set of classifications consists, on the one hand, of renters receiving public assistance from the Department of Public Welfare and, on the other, of renters not receiving public assistance. The second set consists of renters receiving public assistance as opposed to homeowners receiving public assistance. Plaintiffs maintain that such classifications impermissibly discriminate against renters on public assistance because they are irrational given the stated purpose of the Act and because any classification designed solely to exclude from benefits people on welfare does not promote a legitimate governmental interest. In support of their contentions plaintiffs point to the declaration of legislative policy contained in section 4751–2 of the Act:

In recognition of the severe economic plight of certain senior citizens, widows, widowers and permanently disabled persons who are real property owners or renters with fixed and limited incomes who are faced with rising living costs and constantly increasing tax burdens upon their homesteads, the General Assembly, pursuant to the

21. In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973), the Supreme Court defined, in the negative, a suspect class:

The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness; the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

22. *See, e. g., Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (granting indigent defendants a state-appointed attorney on appeal) and *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (granting indigent defendants a

free trial transcript on appeal) ; *see also Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (striking down on due process grounds Connecticut's divorce court fees and costs for indigent litigants).

23. In their complaint plaintiffs identify a third set of classifications. Since the benefits under the Act are determined by the annual household income, this third set consists, on the one hand, of renters receiving public assistance for some months of the year whose benefits are therefore determined partly on the basis of income received during months of ineligibility and, on the other, of homeowners and renters not on public assistance whose benefits are determined wholly on the basis of income received during months of eligibility. Any further consideration of these classes would not effect our holding.

mandates of the Constitutional Convention of 1968, considers it to be a matter of sound public policy to make special provisions for property tax assistance or rent assistance in lieu of property taxes to that class of senior citizens, widows, widowers and permanently disabled persons who are real property taxpayers or renters who are without adequate means of support to enable them to remain in peaceable possession of their homes and relieving their economic burden.

Invoking the language of this section, plaintiffs maintain that since they are "renters with fixed and limited incomes who are faced with rising living costs and constantly increasing burdens," they are clearly within the class of persons intended to be benefitted by the Act; to exclude them, they urge, is therefore irrational. Plaintiffs also offer in evidence stipulations of fact which support the proposition that recipients of public assistance in Pennsylvania receive only three-quarters of what the state itself finds necessary for minimum subsistence.[24] In addressing generally plaintiffs' arguments, we note first that the declaration of legislative policy upon which plaintiffs rely does not refer to *all* senior citizens, widows, widowers and permanently disabled persons" in severe economic straits but to *"certain* senior citizens, widows, widowers and permanently disabled persons." Further the limitation to "certain . . . persons" obviously serves the purpose of allowing the state flexibility in extending the benefits of its finite resources to as many needy people as possible without so diluting the benefits that they become economically meaningless. Second, the Act certainly does not reflect a purpose to exclude all welfare recipients since homeowners receiving public assistance are eligible for benefits. Nor do we find that the Act reflects so much a judgment on which classes to exclude as it reflects a judgment on which classes the state can presently afford to include.[25] In leveling their equal protection attack on the Act, plaintiffs rely most strongly on the Supreme Court decisions in *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) and *Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974). The constitutional infirmities detected in these two cases, however, are not discernible in the case before us. In *Moreno* the Court struck down, under an equal protection analysis, section 3(e) of the Food Stamp Act of 1964, as amended 7 U.S.C. section 2012 (e), which excluded from participation

---

24. The following facts were admitted into evidence over defendants' objections based on relevance and materiality:

> 17. As of January 1, 1970, Pennsylvania's welfare payment level for each county was set at one hundred percent (100%) of the 1957 "standard of need" as costed at then current price levels. At this time the Pennsylvania welfare payment level for Philadelphia County equaled approximately seventy-five percent (75%) of a comparable United States Department of Labor, Bureau of Labor Statistics, "low income" minimum budget for a Philadelphia family of four.

> 18. From January 1970 to the present, Pennsylvania welfare payment levels were raised once, by eleven percent (11%), in April, 1974. During the same period, Social Security benefit levels were raised four times January 1971 [ten percent (10%)];

September, 1972 [twenty percent (20%)]; March, 1974 [seven percent (7%)]; and June, 1974 [four percent (4%)].

> 19. From January 1970 to October 1974, the Bureau of Labor Statistics' Consumer Price Index for Philadelphia rose thirty-eight percent (38%).

> 20. Current Pennsylvania welfare payment levels provide seventy-eight percent (78%) of the 1957 "standard of need" as costed at October 1974 prices.

Pretrial Order at 7–8.

25. We note again here the January 1975 regulations of the Bureau of Tax Assistance, *see* note 10 *supra,* under which the Bureau interprets S.S.I. as not included under the heading "public assistance from the Pennsylvania Department of Public Welfare." This interpretation includes under the coverage of the Act a new group of people, those whose only state subsidies come to them through this partly state-funded program.

in the food stamp program any household which contained a member unrelated to any other member of the household. The Court held that such an exclusion violated equal protection because it did not rationally advance the legislative objective of combatting fraud and because its goal of preventing "hippies" and "hippie communes" from participating in the food stamp program was not a legitimate governmental goal. The legislative exclusion we consider here, however, does rationally further the legitimate legislative objective of distributing limited benefits to a large number of needy people without reducing the amount each person receives below the point at which it can be helpful. Neither do we detect in the Act nor anywhere else for that matter [26] a state purpose of preventing welfare renters from participating in benefits because of their political unpopularity. In *Jimenez* the Court considered a provision of the Social Security Act which discriminated against certain classes of illegitimate children, and, for this reason, *Jimenez* is not particularly helpful here since the Court, as it frequently does in reviewing legislation affecting illegitimate children, appears to scrutinize the legislative classification under attack more closely than we find ourselves permitted to do here. Moreover, as Justice Rehnquist points out in dissent, 417 U.S. at 638, 94 S.Ct. 2496, in spite of the equal protection language in the majority opinion, the majority analysis in *Jimenez* sounds much more akin to a due process analysis which finds the legislation constitutionally wanting because of the presence of an impermissible irrebuttable presumption.

Rather than *Moreno* and *Jimenez*, the line of cases which we find persuasive begin with *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), and continue through *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), *Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), and *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). These cases, recognizing that courts must allow state legislatures a good deal of flexibility in confronting the complex socio-economic problems of their citizenry, apply a low level of scrutiny to good faith legislative attempts to solve some of these problems and strongly underwrite the constitutionality of a state's proceeding to remedy its ills one at a time. Applying the doctrine that emerges from these cases to the legislative scheme under consideration here, we find no violation of equal protection. In defending the legislative distinction between renters receiving public assistance and renters not receiving public assistance, the state defendants assert that it is rational to assist first those groups who receive no other public assistance. In defending the legislative distinction between renters receiving public assistance and homeowners receiving public assistance, the state defendants assert that it is rational to aid the latter, a small group (10% of all public assistance recipients) who do not add a substantially greater cost to the program; the former, on the other hand, are a very large group (90% of all public assistance recipients), the additional coverage for which would add greatly to the cost of the Act. Further, in exchange for public assistance, homeowners give the state a lien on their property.[27] We accept these justifications as rational and legitimate. Given these justifications, then, and the lack of any suspect or "almost suspect" classification

---

26. The legislative history of the Act is extremely scant.

27. In *Charleston v. Wohlgemuth*, 332 F.Supp. 1175 (E.D.Pa.1971), *aff'd.*, 405 U.S. 970, 92 S.Ct. 1204, 31 L.Ed.2d 246 (1972), a three-judge court from this district upheld against constitutional and federal statutory attack requirements of the Pennsylvania Department of Public Welfare that AFDC applicants give the state a lien on certain types of real or personal property as a condition of receiving assistance.

in the Act, we must follow the dictate of *Dandridge* that

> The Constitution may impose certain procedural safeguards upon systems of welfare administration . . . . But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.

397 U.S. at 487, 90 S.Ct. at 1163. The scheme of the Senior Citizens Property Tax Assistance Act merely reflects a judgment to take one step or one set of steps before another.[28] Under *Lee Optical, Dandridge, Jefferson,* and *Geduldig,* such a judgment does not violate the Constitution.

### IV. Due Process

 Despite the immediate appeal of plaintiffs' arguments, neither can we hold that the Act violates the due process clause of the Fourteenth Amendment. Plaintiffs urge that the classifications under the Act are founded on two constitutionally unacceptable irrebuttable presumptions. First, plaintiffs maintain, the Act conclusively presumes that renters who receive public assistance do not need any further shelter subsidy; second, it presumes that public assistance received in some months reduces the need for benefits under the Act in other months. The short answer to these arguments is that the record contains no evidence that the Act presumes either of these situations, and, indeed, the state denies any such presumptions. The Act merely embodies the state's choice of who to aid first and under what program.

*United States Department of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973), is a case in which the Supreme Court expressly sustained an irrebuttable presumption attack on welfare legislation; *Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974), and *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), are two cases which fit the framework of an irrebuttable presumption analysis although the Court did not explicitly place them there. All three cases are distinguishable from the case at bar in that the legislative schemes under attack in the Supreme Court cases presumed conclusively that certain groups defraud the government or tend to abuse its welfare programs: households containing persons claimed as tax deductions by someone outside the households in *Murry,* a certain class of illegitimate children in *Jimenez,* and "hippies" and "hippie communes" in *Moreno.* Or, if the legislation did not presume abuse conclusively, it determined that the best method of protecting against abuse was to deny benefits to a large class some of whose members were suspected of defrauding the government. These kinds of schemes the Court found irrational and constitutionally impermissible. The classifications under attack here, however, are not aimed at protecting against any kind of eligibility fraud or abuse of governmental welfare programs; rather they aim to protect the fund set up by the Act so that the Act can truly help those people its benefits reach. Since the purpose of the Act under consideration here is to aid as many people as possible without severely diluting the benefits available and because a state may extend its benefits to one group or combination of groups at a time so long as it does not invidiously discriminate against any identifiable group, we

---

**28.** As Judge Fogel expresses the thought in *Kohr v. Weinberger,* 378 F.Supp. 1299, 1304–05 (E.D.Pa.1974) (three-judge court),

> The fact that [a legislative scheme] may deal with only one aspect of the problem does not render it constitutionally defective;

> the government may choose to treat only one phase of a problem, neglecting others, for it is not compelled to choose between a course of total assault on every aspect of a problem or one of complete abstention.

 

hold that the legislative classification which excludes renters receiving public assistance from coverage under the Act does not violate due process of law.

In summary, then, we hold that a genuine case or controversy exists between plaintiffs and defendants, that all plaintiffs have the requisite capacity and standing to bring and maintain this action, and that venue is proper in this district. We further hold that section 4751–4(d) of the Pennsylvania Senior Citizens Property Tax Assistance Act, which excludes from benefits renters receiving public assistance from the Department of Public Welfare, is constitutional under both the equal protection and the due process clauses of the Fourteenth Amendment.[29]

29. Because we find section 4751–4(d) constitutional, we have no occasion to address defendants' Eleventh Amendment challenge to plaintiffs' request that we order the 1974 filing period reopened.