**Barbara DUBINSKI for Gary R. VAN SCHINDEL, Plaintiff-Appellant,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant-Appellee.**

No. 85–2417.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1986.

Decided Dec. 19, 1986.

Robert G. Henderson, Western Wis. Legal Service, LaCrosse, Wis., for plaintiff-appellant.

Mimi Hwang Leahy, Dept. of Health & Human Service, Chicago, Ill., for defendant-appellee.

Before FLAUM and EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.*

* The Honorable Hubert L. Will, of the Northern District of Illinois, sitting by designation.

EASTERBROOK, Circuit Judge.

Gary R. Van Schindel, the son of Barbara Dubinski and Gary C. Van Schindel, was born in February 1971, about 6½ months after his father's death. Barbara and Gary C. were engaged to be married, but they did not live together after she became pregnant. During the 2½ months between Gary R.'s conception and Gary C.'s death, Gary C. did not provide regular financial support to Barbara. In 1980 Barbara filed an application on Gary R.'s behalf for survivor's benefits under the Social Security Act. See 42 U.S.C. § 416(h)(3)(C)(ii), establishing the terms on which an illegitimate child may recover on the basis of a deceased parent's earnings. The administrative law judge rejected the claim, concluding that Gary C. had not provided the level of support to Barbara and Gary R. required by the governing regulation, 20 C.F.R. § 404.366(a)(2).

In the district court Barbara and Gary R. pinned their principal hopes on a constitutional challenge to § 416(h)(3)(C)(ii), and the magistrate recommended that the district court declare the statute unconstitutional. The district judge disagreed, and in a subsequent case this court sustained the statute. *Imani v. Heckler*, 797 F.2d 508, 513 (7th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). The constitutional argument here is no stronger. As the statute applies to this case, Gary R. is entitled to survivor's benefits only if he can establish that Gary. C. "was living with or contributing to the support of the applicant at the time such insured individual died." 42 U.S.C. § 416(h)(3)(C)(ii). Gary C. was not living with Barbara, so whether he was "contributing to the support of" Gary R. becomes the central question.

The difficulty, of course, is that it is hard to "contribute to the support of" a person not yet born. During the 2½ months between Gary R.'s conception and Gary C.'s death, Gary R. had little need of "support" apart from Barbara; even medical needs were minimal. The child's support comes from the mother. The administrative law judge concluded that Gary C. had not furnished either Gary R. or Barbara the sort of support required by 20 C.F.R. § 404.366(a)(2), which defines "contributing to the support of":

> Contributions must be made regularly and must be large enough to meet an important part of your [i.e., the child's] ordinary living costs. Ordinary living costs are the costs for your food, shelter, routine medical care, and similar necessities. If the insured person only provides gifts or donations once in a while for special purposes, they will not be considered contributions for your support.

The regulation is not a perfect match with a case, such as ours, in which the insured wage earner dies before the child is born. The administrative law judge responded by inquiring not only whether Gary C. supported Gary R. but also whether he supported Barbara. The Secretary concedes that this modification is appropriate.

The evidence before the administrative law judge showed that Barbara had a medical examination two months into her pregnancy but could not recall who paid for the examination. Barbara also testified that Gary C. "was helping me out in that way ... he'd, you know, help me ... buy clothes, things like that." In context, "in that way" suggests that Gary C. provided cash on occasion, although Barbara did not attempt to quantify the donations. The statement that Gary C. would "help" Barbara "buy clothes" could mean only that he went shopping with her, but it could also indicate contributions toward the purchases. This meager evidence of support did not convince the administrative law judge that Gary C. had made contributions "regularly" or that the contributions met "an important part" of Barbara's costs of food, shelter, medical care, or other necessities. The district court found this conclusion supported by substantial evidence, as do we.

Three courts of appeals have held that when the father dies before or shortly after the child is born the regulation should be discarded in favor of the inquiry whether the father made contributions "commensurate with the needs of the unborn child at the time of the father's death". *Adams v. Weinberger*, 521 F.2d 656, 660 (2d Cir. 1975). See also *Parsons v. Health and Human Services*, 762 F.2d 1188, 1191 (4th Cir.1985); *Doran v. Schweiker*, 681 F.2d 605, 608–09 (9th Cir.1982). Our opinions in *Imani* and *Schaefer v. Heckler*, 792 F.2d 81 (7th Cir.1986), indicate some sympathy with the approach of *Adams*. Barbara and Gary R. claim the benefit of *Adams*, essentially arguing that because an unborn child 2½ months after conception has no significant "needs", the lack of support from Gary C. is unimportant. On this view, Gary C. provided all the support Gary R. needed—none—and it is unjust to deny Gary R.'s request for benefits just because his father died before there had been an opportunity to provide support.

■ The Secretary defends the regulation by observing that survivor's benefits are designed to replace support lost by the demise of the wage earner, something the Supreme Court emphasized in *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), and we reiterated in *Imani* and *Schaefer*. If Gary R. really had no needs, then what was lost was the prospect of future support, at a time when Gary R. would need it. Yet it is settled that a lost prospect of support does not establish entitlement to survivor's benefits. If a lost prospect were sufficient, then a child could qualify for benefits even though the deceased parent never supplied support of any kind during the parent's life. The statute, which makes contributions to the child's support a condition of eligibility for benefits, precludes an approach that disregards actual support.

Although *Imani* and *Schaefer* did not endorse the regulation's regular-support test, neither did they embrace an approach under which no support, or occasional gifts, would be sufficient. *Imani* and *Schaefer*

leave open the question whether this circuit will follow *Adams* when the need to choose is squarely presented. Neither case explicitly discussed the issue, because in each case the claimant failed even to meet the *Adams* standard. We treat *Imani* and *Schaefer* as using the *Adams* standard arguendo, as shall we.

*Schaefer* states that notwithstanding the difficulty of showing contributions to the "support" of the unborn, "some tangible support is still required to justify an award of benefits under section 416(h)(3)(C)(ii); a mere expectation of support from the insured wage earner is not enough." 792 F.2d at 86. See also, e.g., *Johnson v. Secretary*, 801 F.2d 797 (6th Cir.1986). *Schaefer* held that promises to marry and pay hospital expenses of the mother did not fulfill the statutory requirement, although the opinion suggests that "support to cover medical costs for prenatal care as well as costs incurred in preparing for the baby's arrival such as, for example, the purchase of clothing" (*id.* at 86–87) might be sufficient. *Imani* held that occasional support for the mother is not enough. The father in *Imani* "apparently spent some money on beer and food when [he and the mother] were together, but to say that these expenses satisfy § 416(h)(3)(C)(ii) means that courtship is tantamount to support, which, in view of the purposes of the Act, ... cannot be correct." 797 F.2d at 513.

■ Gary C.'s occasional gifts of cash and perhaps clothing also are courtship rather than support. Barbara's "support" came from her own savings. The record does not show that Gary C. paid for Barbara's medical care or donated significant amounts of cash. The parties have not cited, and we could not find, any case holding that evidence so thin compels an award of benefits. The most that could be said is that Gary C. was saving money that could be used to support the child—which, from Gary R.'s perspective, is an expectation of *future* support in unalloyed form.

The record in this case therefore does not establish an entitlement to benefits under either the regulation or an approach more

favorable to the claimants. Although Barbara and Gary R. ask us to remand the case to the Secretary so that they may adduce more evidence, they did not ask the district court for this relief, and they also do not suggest what additional evidence is available, why this evidence would establish an entitlement to benefits, and why they did not offer it before. They were represented in the administrative hearing by the same law firm that has prosecuted their case in this court. They had every reason to present to the administrative law judge any available bit of evidence; the more they could present, the more likely an award of benefits. The difference between the standard under 20 C.F.R. § 404.-366(a)(2) and that of *Adams* does not affect a claimant's incentive to present evidence, and there is accordingly no reason to give the claimants here another evidentiary hearing.

AFFIRMED

FLAUM, Circuit Judge, dissenting.

The Social Security Act provides that every child whose parent is insured by the Social Security System "shall be entitled to a child's insurance benefit" if, at the time of the insured parent's death, the child was "dependent" on the parent. 42 U.S.C. § 402(d) (1982 & 1985 Supp.). Under the Act, all legitimate children are "deemed dependent" on the insured parent. 42 U.S.C. § 402(d)(3). In addition, those illegitimate children whose parentage is established before the death of the insured parent are also "deemed dependent." *Id.* However, illegitimate children whose insured parent dies without establishing parentage are only considered "dependent" if they demonstrate that, at the time of their insured parent's death, the parent was "living with" or "contributing to" their "support." *Id.* at § 416(h)(3). Because Gary C. Van Schindel died six months before his illegitimate child was born, he had no meaningful opportunity to establish paternity. As a result, in order to obtain survivor's benefits, his son is placed in the curious position of having to prove that, while a fetus, he was "dependent" on his father.

It is clear that in enacting the Social Security Act Congress did not consider the rare case, such as this, in which the father of an illegitimate child dies before the child is born. The concept of "dependency" has virtually no meaning when assessing the relationship between an unborn child and its father. The biological reality is that a fetus is "dependent" solely on its mother. If Gary R. Van Schindel must prove that, at the time of his father's death, he was *actually* dependent on his father, his claim must fail. However, if actual dependence is required, the claims of all children—legitimate or illegitimate—who are born after the death of their father must also fail.

Rather than denying survivor's benefits to any child born after his or her father's death, the Social Security Administration assumes that a fetus whose parents were married, *see* 42 U.S.C. § 402(d)(3), or whose father was living with its mother, *see id.* at § 416(h)(3), or whose father was supporting its mother, SSR 68-22 (1968), was "dependent" on the father at the time of his death. The fact that the Social Security Administration provides benefits to these children—who were not actually "dependent" on their fathers at the time of their deaths—suggests that "dependent" must be given a special meaning when applied to a fetus. *Cf. Jimenez v. Weinberger*, 417 U.S. 628, 634–35, 94 S.Ct. 2496, 2500–01, 41 L.Ed.2d 363 (1974) (The availability of disability benefits to legitimate children born after their parents' disability demonstrates that "dependents" does not mean only those who lost "actual support.").

In determining what it means for a fetus to have been "dependent" under § 416(h)(3) because its father "contribut[ed] to" its "support," we should seek to give "dependent" a meaning that best harmonizes this provision with the other provisions of the Social Security Act. The Supreme Court has made clear that children may not prove that they were dependent merely by asserting that, because of their parents' death, they lost a *"potential* source of lifetime

support." *Mathews v. Lucas,* 427 U.S. 495, 508 n. 14, 96 S.Ct. 2755, 2763–64 n. 14, 49 L.Ed.2d 651 (1976) (emphasis added). This certainly should apply to the unborn. Consequently, the mere possibility that, had the father lived, he *might* have provided support to the fetus after its birth is not sufficient to demonstrate that his unborn child was "dependent." At the same time, the fact that the Social Security Administration will deem a fetus "dependent" if, at the time of its father's death, its parents were married, or living together, or if its father was supporting its mother, is also significant. These parental actions provide strong evidence that the father had begun to act in a manner that makes it reasonable to presume that he would have *actually* supported the child once it was born. In a similar manner, when determining whether an illegitimate fetus was "dependent" because its father was "contributing" to its support, the Social Security Administration should determine whether the father, while alive, had taken concrete actions that provide a significant indication that, but for his untimely death, he would have assumed appropriate responsibility for his child after its birth.

Realizing the special considerations involved with "afterborn illegitimates," several circuits have adopted a test that seeks to determine whether the father's actions provide sufficient evidence that, had death not intervened, he would have fulfilled his responsibilities. These courts have interpreted the requirement that the father have "contribut[ed] to the support" of the child to mean that the father must have made contributions "commensurate with the need of the unborn child at the time of the father's death." *Adams v. Weinberger,* 521 F.2d 656, 660 (2d Cir.1975). The *Adams* test looks pragmatically at the father's resources and the point in the pregnancy at which he died. The test recognizes that a small contribution by a poor man early in a pregnancy can be a sufficient indicator that, had he lived, he would have taken responsibility for his child.

The *Adams* test mirrors the overall balance that the Social Security Act strikes.

This approach seeks to prevent "claims from children who have no financial interest in their father's deaths but for the possible windfall benefits that the Social Security Act would bestow upon them." *Adams,* 521 F.2d at 659–60. At the same time, in keeping with the broad presumptions that the Social Security Act extends to most children, it gives illegitimate children born after the death of their fathers the benefit of the doubt.

The majority suggests that while we have expressed support for the *Adams* test, we have not yet adopted it. *Supra,* at 613. I disagree. In *Schaefer v. Heckler,* 792 F.2d 81 (7th Cir.1986), we evaluated the plaintiff's claim for survivor's benefits using the *Adams* standard. *See id.* at 86–87. In *Imani v. Heckler,* 797 F.2d 508 (7th Cir.1986), we went further, stating unambiguously that "when the applicant is an illegitimate child born after his alleged father … dies … the Secretary should consider whether the alleged aid is commensurate with the needs of the unborn child at the time of the father's demise." *Id.* at 513 (*citing Schaefer*). It is true that in both cases we concluded that even under the *Adams* standard the claimants were not entitled to benefits. In the strictest sense, therefore, our comments in *Schaefer* and *Imani* could be dismissed as *dicta.* To do so, however, would be, in my view, an excess of formalism. The relevant fact is that in both cases we utilized the *Adams* test in reaching our decision. We have also directed the Secretary of Health and Human Services to do so in future cases. *Id.* Reopening this question can only lead to uncertainty and additional, needless litigation.

While the majority does not consider itself bound by the *Adams* test, they do give some consideration to it. However, I believe that they have not fully considered the specific facts at issue in this case. The majority suggests that Gary C. Van Schindel, the father, supplied either no support, *supra* at 613, or, at best, made gifts of "courtship" to the mother, Barbara Dubinski, *supra* at 613. These assertions do not

address several significant efforts that Ms. Dubinski alleges that Mr. Van Schindel made. The opinion of the Administrative Law Judge indicates that he did not dispute these claims. Specifically, Ms. Dubinski alleges that Mr. Van Schindel encouraged her to see a doctor to determine whether she was pregnant; he accompanied her to the doctor's office; he continued to work steadily; he began to save money for the baby; he made an effort to secure a marriage license; he travelled from the town in which he worked to spend each weekend with Ms. Dubinski; and he occasionally provided cash or other assistance.[1]

The evidence concerning Mr. Van Schindel's acceptance of his impending parental responsibility is far greater than the evidence in either *Schaefer* or *Imani*. In *Schaefer*, the father's only efforts were his vague "promise to marry and his promise to pay hospital expenses." *Schaefer*, 792 F.2d at 86. In *Imani*, it was clear that, at the time of his death, the father had indicated by his conduct that he would not take the necessary responsibility. *See Imani*, 797 F.2d at 513.

Gary C. Van Schindel's efforts were also more extensive than that of the father in *Doran v. Schweiker*, 681 F.2d 605 (9th Cir.1982). Like Gary C. Van Schindel, the father in that case was an impoverished worker who died when his child was a three month old fetus. Despite the fact that his only "contributions" were to transport the mother's belongings to a cabin and to return on one occasion to fix the roof, the court held that his efforts were sufficient to meet the *Adams* standard. Mr. Van Schindel's efforts are at least comparable to those of the father in *Parsons v. Health and Human Services*, 762 F.2d 1188 (4th Cir.1985). In that case, the father, who

earned $8,000 a year and died when his child was a five month old fetus, made regular weekend visits to the mother and gave her $50 to pay for transportation costs to the doctor. Here, again, the court held this to be sufficient to meet the *Adams* standard.[2]

I believe that, given Mr. Van Schindel's limited financial resources, and the very early stage in the pregnancy at which he died, he made contributions "commensurate with the needs of the unborn child at the time of [his] death." *Adams*, 521 F.2d at 660. His actions indicate that, but for his untimely death, he would have fulfilled his responsibilities to his son. Consequently, his "contributi[on] to the support," 42 U.S.C. § 416(c)(3), of Gary R. Van Schindel was sufficient to make his son "dependent" on him within the meaning of the Social Security Act. I would, therefore, reverse, and enter judgment for the appellant.

---

1. I find it ironic that if Mr. Van Schindel had quit his job, moved in with Ms. Dubinski, and gone on relief, their son would have been automatically eligible for Social Security, *see* 42 U.S.C. § 416(h)(3), but that because he remained in another town so he could save money, his child is to be denied benefits. I cannot believe that Congress would sanction so absurd a result.

2. Gary C. Van Schindel's contributions were not as great as those of the father in *Adams*. In that case, the father contributed $400 to the mother and allowed her to live rent free in his apartment. However, the father's opportunity for support was far greater in that case. The father was the operator of a Manhattan restaurant who lived until the seventh month of the pregnancy. *See Adams*, 521 F.2d at 660.