914 F.2d 987
 31 Soc.Sec.Rep.Ser. 177, Unempl.Ins.Rep. CCH 15684A
Betty BENNEMON, on Behalf of Tarelle WILLIAMS, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 89-2996.
 United States Court of Appeals,
Seventh Circuit.
 Argued Aug. 8, 1990.
Decided Oct. 1, 1990.
 
 Donald Radosevich, Radosevich, Mozinski & Cashman, Manitowoc, Wis., for plaintiff-appellant.
 Stephen J. Liccione, Asst. U.S. Atty., Office of the U.S. Atty., Milwaukee, Wis., Donna L. Calvert, Dept. of Health and Human Services, Region V, Office of the General Counsel, Chicago, Ill., for defendant-appellee.
 Before POSNER and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 This is an appeal by a disappointed applicant for child's social security survivor benefits. The child, Tarelle M. Williams, is the illegitimate son of Betty Bennemon, who claims that the father is George Williams, a deceased wage earner covered by social security, and that, as his child, Tarelle is entitled to the benefits that Bennemon is seeking on Tarelle's behalf. In days of yore, the claim would have been laughable from a legal standpoint; illegitimate children had no entitlements to inherit, 1 Blackstone, Commentaries 458 (1765), and social security survivor's benefits are a form of inheritance--inheritance of an entitlement to government benefits. Society wanted to channel all sexual activity into marriage, so far as possible; and one way to discourage extramarital sexual activity, it may have seemed, was to penalize the offspring by stigmatizing them as bastards and denying them the rights that legitimate children enjoy. How effective a deterrent may be questioned. One effect is to reduce a potential cost of children to the father, since, unlike legitimate children, illegitimate ones have no rights in his estate. At all events, in this as in most other countries the channeling policy as we have called it has withered, and the illegitimate birth rate, relative to the legitimate birth rate, has soared; and it has come to seem, to many, that the disabilities attached to bastardy are now pointless and savage.
 
 
 2
 In a series of decisions illustrated by Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), and Jimenez v. Weinberger, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974), the Supreme Court invalidated, as denials of equal protection, discriminations against illegitimate children that could not be justified other than as efforts to penalize illegitimacy. Yet the Court refused to view other justifications offered for such discriminations as skeptically as the justifications offered for discriminations considered deeply invidious, such as discrimination based on race. Mathews v. Lucas, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). In 1965, shortly before the Supreme Court in Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), and Glona v. American Guarantee & Liability Ins. Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968), first discovered the constitutional rights of the illegitimate, Congress had broadened the rights (theretofore slight) of illegitimate children under the social security statute, creating the legal structure that we apply today (the 1965 statute, so far as is relevant to this case, has not been amended, notwithstanding the Supreme Court's subsequent recognition of the constitutional rights of illegitimate children). DiGiovanni v. Ribicoff, 288 F.2d 158, 159 (D.C.Cir.1961) (per curiam); Comment, 73 Ia.L.Rev. 1213, 1214-16 (1988).
 
 
 3
 This background may make a bit more intelligible than would otherwise be the case the curious structure of the provisions of the social security law relating to benefits for the child of a deceased wage earner. If the child's biological mother is married to the child's father (the deceased wage earner), then the child is eligible, without more, for the benefits; so too (with an unimportant qualification) if the child is the adopted child of the wage earner. 42 U.S.C. Secs. 402(d)(3)(A), (d)(8). And for these purposes a common law marriage is good enough. Sec. 416(h)(2)(B). But if the child is illegitimate, he must squeeze himself into one of a limited set of niches, and if he can't, then he gets no benefits even if there is little doubt that the deceased wage earner was the child's biological father, which is the case here. The niches are: eligibility to inherit under the law of the pertinent state (in effect deferring to state policy on the rights of the illegitimate); a written acknowledgment of parenthood by the deceased wage earner or a judicial determination to that effect; or a determination by the Social Security Administration that the deceased was the parent and, at the time of his death, was either living with the child or "contributing to the [child's] support." Secs. 416(h)(2)A), (3)(C)(i), (ii).
 
 
 4
 George Williams and Betty Bennemon met about a year before his death. They fell in love and entered upon a sexual relationship, exclusive on her side, but they lived apart. Bennemon had a bad credit record, and to enable her to obtain electricity and telephone service Williams, who had either a good credit record or no credit record (we do not know which), subscribed to these services for her in his name. He also paid a couple of utility bills, although the record contains no details. Bennemon became pregnant, and both she and Williams told their friends that he was the father. There is no reason to doubt that they were speaking truthfully. The testimony of friends is that Williams was thrilled by the prospect of becoming the father of a son, as he hoped the fetus would turn out to be. Of course all this evidence may have been hoked up for this proceeding, but there is no indication of that.
 
 
 5
 Two months after Betty Bennemon became pregnant, George Williams was stabbed to death in a brawl outside a bar. He had never made a written acknowledgment of parentage. He had never been decreed a parent. There is no contention that the law of Wisconsin would have entitled Tarelle to inherit from Williams had he left an estate. There was no marriage, common law or otherwise. And Williams did not live with Bennemon. The only remaining route for establishing Tarelle's eligibility for benefits was to show that Williams had contributed to the child's support during the two months of pregnancy before Williams' unexpected death.
 
 
 6
 The administrative law judge found not only that Williams had not contributed to the support of Tarelle (or rather the fetus that was to become Tarelle seven months later) within the meaning of the statute and its implementing regulations, but also that Bennemon had failed to prove that Williams was the father. The latter finding is unexplained and probably wrong, but the error is immaterial if the finding that Williams did not contribute to Tarelle's support is supported by substantial evidence.
 
 
 7
 An initial complication arises from the fact that Williams died early in Bennemon's pregnancy. A father does not provide support directly to his child while it is still in the mother's womb, so if the statute were interpreted literally a child born after his father's death would rarely if ever be able to establish a claim under 42 U.S.C. Sec. 416(h)(3)(C)(ii). The Social Security Administration does not read the statute literally. It is satisfied if during the pregnancy the father provides support to the mother. Dubinski v. Bowen, 808 F.2d 611, 612 (7th Cir.1986).
 
 
 8
 How much support? The statute does not say, but the Social Security Administration has issued a regulation which requires that it have been "regular and substantial." 20 C.F.R. Sec. 404.366(a)(2). In the case of an unemployed or sporadically employed father living at the margin of society, such as the late George Williams, strict application of this test would preclude the award of benefits. It has seemed more civilized to the Sixth Circuit to measure the adequacy of the support by the father's means than automatically to bar the children of the very poor, who, after all, need these modest benefits ($180 a month, we were told at argument) more than other children do. Parker v. Schweiker, 673 F.2d 160 (6th Cir.1982); Childress v. Secretary of Health & Human Services, 679 F.2d 623 (6th Cir.1982); Boyland v. Califano, 633 F.2d 430 (6th Cir.1980); Young v. Secretary of Health & Human Services, 787 F.2d 1064, 1069-70 (6th Cir.1986). The Social Security Administration declines to acquiesce in this position outside the Sixth Circuit. Another line of cases challenging the "regular and substantial" criterion, but limited to cases in which the wage earner died before the child was born, emphasizes the limited needs of a fetus and holds that the statute requires only that "the support by the father for the unborn child [be] commensurate with the needs of the unborn child at the time of the father's death." Adams v. Weinberger, 521 F.2d 656, 660 (2d Cir.1975). See also Parsons v. Health & Human Services, 762 F.2d 1188, 1191 (4th Cir.1985). The two lines merge in Doran v. Schweiker, 681 F.2d 605, 609-10 (9th Cir.1982), where the poverty of the father and the limited needs of the fetal child led the court to hold that help in moving the mother to a new home and repairing the roof satisfied the statutory requirement of support. This circuit has not adopted either line of cases. Although it cited cases from both lines (namely Boyland, Adams, and Doran ) with apparent approval in Schaefer v. Heckler, 792 F.2d 81, 86 (7th Cir.1986); see also Imani v. Heckler, 797 F.2d 508, 513 (7th Cir.1986) (seeming to approve of the Adams rule, in dictum, though without citing Adams ), their status in this circuit must be considered an open question. Dubinski v. Bowen, supra, 808 F.2d at 613. One thing that is clear from our decisions, however, is that trivial and sporadic gifts from father to mother during the mother's pregnancy are not support within the meaning of the statute. We so held in both Imani and Dubinski.
 
 
 9
 The Social Security Administration defends its regulation by reference to what it takes to be the purpose of the program of survivors' benefits--which is, as can perhaps be gleaned from the statement in the Senate Report, made in reference to the broadening of benefits to illegitimate children in 1965, that the program is "intended to pay benefits to replace the support lost by a child when his father" dies, S.Rep. No. 404, 89th Cong., 1st Sess. 110 (1965), 1965 U.S.Code Cong. & Admin.News pp. 1943, 2050; see also Mathews v. Lucas, supra, 427 U.S. at 507-16, 96 S.Ct. at 2763-67; Dubinski v. Bowen, supra, 808 F.2d at 613; Chester v. Secretary of Health & Human Services, 808 F.2d 473, 478 (6th Cir.1987)--to replace the support that the child could have expected to receive had the father lived. The benefits, though not princely, might well exceed the support provided by a very poor man, even if that support were a large part of his income. The purpose of the "regular and substantial" regulation is to prevent the child from reaping a windfall by virtue of the death of a father whose contribution to the child's support would not have been as large as that provided by the child's survivor benefits.
 
 
 10
 This rationale underscores the disparity in treatment between legitimate and illegitimate children. The legitimate child receives survivor's benefits no matter how poor or feckless or absent the father is, provided only that the father had social security coverage, whereas the illegitimate child who cannot fit himself within one of the other provisions of the statute receives benefits only if his father was a responsible father as measured not only by willingness, but also by ability, to contribute regularly and substantially to the support of his child. There are unexplained disparities even within the statute's treatment of illegitimate children, under the view propounded by the Social Security Administration. The child whose father happens to make written acknowledgment of parentage--something that for all we know George Williams would have done had he known his end was so near--is entitled to benefits even if the father had never contributed a nickel to the child's support, and never would.
 
 
 11
 Maybe all the statute is really after is hard evidence of paternity, and the framers thought that contributing to the child's support was a kind of surrogate acknowledgment of paternity--how likely is one to support a child one does not believe to be one's own? This interpretation is consistent with the statutory provisions on illegitimacy as a whole, which can be viewed as a demand for hard evidence of paternity, irrelevant in the case of a legitimate child. The Administration has not proposed this interpretation, however, no doubt inhibited by Jimenez, where the Supreme Court rejected the evidentiary rationale in striking down another provision of the social security law discriminating against illegitimate children. The Administration takes the safe route by arguing quid pro quo, because that is the argument that persuaded the Court in Lucas to uphold the constitutionality of the very provision in issue here, requiring proof that the deceased wage earner contributed to the child's support. The argument fails, it is true, to make sense of the statute as a whole. But not every statute makes sense as a whole. This statute may not be coherent in an intellectual sense, for the framers may have wanted to preserve, and not merely on evidentiary grounds, a distinction between the entitlements of legitimate and illegitimate children. Nor need such a desire be thought merely cruel and ignoble, for the subsidizing of illegitimate births is no favor in the long run to the millions of people mired in the culture of poverty that is associated with rampant illegitimacy. And since the willingness of Congress to fund social programs is distinctly finite, generosity to one class of claimants may spell tightness toward another.
 
 
 12
 It would be delicious to follow out these byways, but they would lead nowhere in this case. Bennemon cannot (after Lucas ) and does not question the constitutionality of the statute, nor the soundness of our decisions that require that support be more than sporadic, if not necessarily substantial. The payment of a couple of utility bills will not do, especially without a clearer idea of frequency and magnitude. And there is no indication that either payment came after Bennemon became pregnant. As the Social Security Administration delicately if inaccurately puts it (for there is no indication that marriage was ever contemplated), they may have occurred during the "courtship" period, and if so are not a reliable augury of the support that Williams might have provided (had he lived) after Bennemon became pregnant and after Tarelle was born--support that the benefits sought would replace. A telling bit of evidence is that Bennemon's phone service was cut off during her pregnancy, before Williams' death; it seems he did not redouble his efforts at support when she became pregnant.
 
 
 13
 The nicest question in the case is whether Williams' lending his name to enable Bennemon to obtain utility services is a form of support that ought to be counted in deciding whether the statute has been satisfied. There is no indication that it cost Williams anything, yet it certainly had financial value to Bennemon and after she became pregnant to their son as well. It was in one sense a mere one-shot deal like the occasional payment of utility bills. But in another and equally valid sense it provided regular and continuous--and substantial--support until the services were cut off, which in the case of the gas and electricity did not occur until Bennemon moved to another apartment, sometime after Williams died. It should not make a difference that support is rendered in kind rather than in cash; that much at least of the Doran decision we can approve unreservedly.
 
 
 14
 But although the question is close, we think the administrative law judge's determination that this "support" should not be assigned to the pregnancy period is supported by substantial evidence. The evidence is all terribly vague, but the lending of Williams' name to Bennemon to obtain utility services appears to have occurred early in the "courtship" period; and while the benefit of the loan would continue until service was cut off, the absence as it were of fresh consideration (except for the payment of the couple of utility bills) prevents us from holding as a matter of law that Williams was contributing support to the woman pregnant with his child. The fact that he let the phone service go is evidence to the contrary. Of course sheer poverty may have prevented him from rendering support that for all we know he was desperately eager to render--he seems to have been looking forward with genuine enthusiasm to becoming a father. But the statute requires some support--maybe not so much as the Social Security Administration believes but more than Williams provided--and this regardless of financial capability. If Williams had no financial capabilities or expectations whatsoever, as may well have been the case, the award of benefits to his son would indeed be a windfall; Tarelle would have gotten nothing from Williams if Williams had lived, despite the best will in the world. The statute does award this windfall to the legitimate child, but not to the illegitimate one and the difference was sanctioned by Lucas.
 
 
 15
 So the appeal fails; but is the only consequence to direct the applicant to another forum? Tarelle is entitled to benefits if he can show that he would be entitled to inherit from his father under Wisconsin's law of intestate succession. 42 U.S.C. Sec. 416(h)(2)(A). The only possibly applicable provision of that law entitles an illegitimate child to inherit if the father has been determined to be such in a paternity case. Wis.Stat.Ann. Sec. 852.05(1). The requirement of following a specific state-law procedure, as opposed to merely satisfying a substantive criterion of state law, makes unavailable the simple and direct route--administrative determination, by the Social Security Administration itself, without forcing the applicant to go through a state court proceeding--for determining eligibility suggested in a parallel context in Parker v. Sullivan, 898 F.2d 578 (7th Cir.1990). But so far as we know there is no bar even at this late date to Tarelle's bringing a paternity proceeding in a Wisconsin state court. George Williams died in 1986, after Wisconsin amended its law to allow posthumous paternity proceedings. Wis.Stat. Secs. 767.01(3), 767.45; Schaefer v. Heckler, supra, 792 F.2d at 83. And we find no deadline for such proceedings. It is true that if Tarelle attempted to establish his right to social security survivor's benefits under 42 U.S.C. Sec. 416(h)(3)(C)(i)(II), which allows the applicant to prove paternity by submitting a judicial decree that the deceased is the applicant's father, he would fail, because that section expressly requires that the decree have been obtained before the father died. Trammell v. Bowen, 819 F.2d 167 (7th Cir.1987). But if as here the state allows a posthumous paternity proceeding to establish rights of intestate inheritance, a paternity decree not usable under section 416(h)(3)(C)(i)(II) might be usable under (h)(2)(A). Might--but whether it would we need not decide; nor whether the Social Security Administration would in any event have a defense based on administrative res judicata. We mention the matter of paternity proceedings merely to round out the picture of the scheme of entitlements in which the case arose.
 
 
 16
 AFFIRMED.