## IN THE MATTER OF THE ADOPTION OF B. BY E. AND R.

### B. W., PLAINTIFF, v. E. B., DEFENDANT.

Union County Court
Probate Division

July 26, 1977.

*Ms. Elizabeth A. Truly* for plaintiffs E. and R. (*Messrs. Craner & Nelson,* attorneys).

*Mr. Richard M. Williams* for defendant B. W. (*Messrs. Braswell, Wilkerson & Williams,* attorneys).

*Ms. Joan Gelber,* guardian *ad litem,* for B. (*Messrs. Farer & Krueger,* attorneys).

COLEMAN, J. C. C. This matter came before the court as an adoption proceeding initiated by B.'s maternal grandparents, E. and R., on January 28, 1977. A cross-petition for custody, originally filed by B.'s natural father on December 12, 1976 in the Juvenile and Domestic Relations Court was consolidated by the court on April 18, 1977 for hear-

ing with the petition for adoption. A guardian *ad litem* for B. was appointed on June 9, 1977. *R.* 4:26–2(b)(4).

B.'s mother, the daughter of E. and R., died in New York City on or about November 2, 1976. Although E. and R. were divorced in September, 1969, both are plaintiffs on the adoption petition. Their status as potential adoptive parents under the statute will be dealt with below.

B. was born on May 24, 1970 as a result of a relationship between plaintiffs' daughter and B.'s natural father, who at the time of B.'s birth was 17 years of age. The couple never married. Subsequent to B.'s birth the mother and son continued to reside in E.'s home for an approximate period of two years. During that time B.'s father visited almost daily. The mother then broke off the relationship, married for a short period of time and then moved to New York City where she lived with another man until her death. From the testimony adduced at the hearing it is clear that except for a three-month period, B. has been under the continuous care and supervision of his maternal grandmother. E. testified that while her daughter spoke with B. almost every day and contributed to his support when possible, she felt compelled to leave her son with E., as a result of her concern with his welfare.

The natural father formally admitted paternity before the Juvenile and Domestic Relations Court some six months after B.'s birth, and was ordered to pay support in the amount of $5 a week. The order was modified in 1975 to increase the amount to $13 a week. A review of the Probation Department records reveals a spotty and irregular payment history. The natural father's contact with B. was quite regular for the two years during which he maintained a relationship with the mother. However, his visits to the child dropped off considerably when B.'s mother left home.

The facts thus framed and the competing interests involved forecast the issues present in this proceeding. Substantial questions exist regarding the rights of the natural

father, the status of E. and R. as plaintiffs, and the best interests of B.

## I. Parental Rights of Unwed Fathers

At the outset, a clarification of the rights of the natural father is in order. Of concern to the court is the applicability of *N. J. S. A.* 9:2–13 and 9:3–18 (see also *R.* 4:94–4(b)), which, by excluding the father of an illegitimate child from the definition of "parent," have the cumulative effect of denying to him any of the benefits of parenthood conferred by the remaining provisions of those chapters. Therefore, the right of the natural father here to custody, and his standing to object to the adoption petition must be examined.

Statutory distinctions between parents of legitimate and illegitimate children, as reflected in the present statutory scheme, cause the court to ponder the same question posed by Vice-Chancellor Howell in *Baker v. Baker*, 81 *N. J. Eq.* 135 (Ch. 1913):

The statutes of this state relative to the custody, care and maintenance of children are supposed to relate solely to children born in lawful wedlock. Why the principles thus legislated upon do not apply with equal force to illegitimates, I am not able to perceive. [at 136]

However, a review of the case law in this jurisdiction as well as recent decisions of the United States Supreme Court concerning distinctions between parents and their children in the context of legitimacy point convincingly to the conclusion that such distinctions are increasingly disregarded as constitutionally infirm.[1] *Stanley v. Illinois*, 405 *U. S.* 645,

---

[1]Among states that have reformed legislation to conform with constitutional standards are Florida, Hawaii, Illinois, Indiana, Michigan, Minnesota, Rhode Island, Utah, Virginia, Washington and Wisconsin. In New Jersey, Senate Bill 1631, passed by the Senate and pending in the Assembly, contains within it an amended definition which reads as follows: "Parent shall mean a natural parent

92 *S. Ct.* 1208, 31 *L. Ed.* 2d 551 (1972) ; *Levy v. Louisiana,* 391 *U. S.* 68, 70–72, 88 *S. Ct.* 1509, 20 *L. Ed.* 2d 436 (1968) ; *Glona v. American Guar. and Liab. Ins. Co.,* 391 *U. S.* 73, 76, 88 *S. Ct.* 1515, 20 *L. Ed.* 2d 441 (1968) ; *Weber v. Aetna Cas. and Sur. Co.,* 406 *U. S.* 164, 175–176, 92 *S. Ct.* 1400, 31 *L. Ed.* 2d 768 (1972) ; *Gomez v. Perez,* 409 *U. S.* 535, 538, 93 *S. Ct.* 872, 35 *L. Ed.* 2d 56 (1973) (per curiam) ; *Jimenez v. Weinberger,* 417 *U. S.* 628, 632, 94 *S. Ct.* 2496, 41 *L. Ed.* 2d 363 (1974) ; and more recently, *Trimble v. Gordon,* 430 *U. S.* 762, 767–773, 97 *S. Ct.* 1459, 1464–1466, 52 *L. Ed.* 2d 31, 38–40 (1977) ; *In the Matter of the Guardianship of C.,* 98 *N. J. Super.* 474 (J. D. R. Ct. 1967) (custody) ; *R. v. F.,* 113 *N. J. Super.* 396 (J. D. R. Ct. 1971) (visitation) ; *E. v. T.,* 124 *N. J. Super.* 535 (Ch. Div. 1973) (custody). See also, *Miller v. Miller,* 504 *F.* 2d 1067 (9 Cir. 1974) *(per curiam)* (statute permitting adoption without notice to natural father of illegitimate, unconstitutional) ; *People ex rel. Slawek v. Covenant Children's Home,* 52 *Ill.* 2d 20, 284 *N. E.* 2d 291 (Sup. Ct. 1972) (statute precluding father of illegitimate child from asserting right to child and denying custody, unconstitutional) ; Annotation, "Discrimination on Basis of Illegitimacy as Denial of Constitutional Rights," 38 *A. L. R.* 3d 613 (1971) ; Annotation, "Right of Putative Father to Custody of Illegitimate Child," 45 *A. L. R.* 3d 216 (1972). For a comprehensive review of authorities see *Guardianship of C., supra.* And, while our own Supreme Court has not specifically treated the issue, it has stated: "Substantial questions exist as to the validity of legislation depriving known or identifiable unwed fathers of notice of proceedings affecting their rights with respect to their children." *Sorentino v. Children's Society of Elizabeth,* 72 *N. J.* 127, 133 (1976). See also, *Attorney General's Formal Opinion* 1975, No. 7. Also relevant

---

or natural parents, without regard to the marital status of either at the time of the child's birth or conception, or a parent or parents by adoption ; \* \* \*"

are the changing economic, social and political conditions mandating the examination of doctrines whose historical significance no longer obtains.[2]

■ The facts presented here take us one step beyond the issues dealt with in *Guardianship of C., supra,* where the putative father sought custody against a petition for guardianship by the Bureau of Childrens Services (now Division of Youth and Family Services). Specifically decided by the court in *C.* was whether the putative father had standing to question custody where the natural mother had surrendered her right to custody, and if so, whether he had a right to custody superior to that of a third-party stranger. The court answered both questions in the affirmative, concluding that the doctrine of *nullius filius* had been impliedly repealed by the enactments of *N. J. S. A.* 9:16–2, 3 and 4. 98 *N. J. Super.* at 484.

N. J. S. A. 9:16–2 requires both the father and mother of the illegitimate child to support and educate the child. By this statute, the father was given the same duties that the mother previously alone had. See *Ousset v. Euvrard,* [Ch.,] *supra.* * * * N. J. S. A. 9:16–1 has given the mother exclusive right to custody, but it would seem that when she abandoned her right, she merely removed the impediment on the father's exercise of his right to custody. [at 487]

The court here need not address the issue of the father's rights *vis-à-vis* the mother's under *N. J. S. A.* 9:16–1, because here the natural mother is dead. Whatever the resolution of that issue may be, it is nevertheless clear that in *any* situation where the mother has either surrendered custody, abandoned her child, will not or cannot invoke her rights under the statute, the father's right to custody as against third-party strangers is a superior one.

---

[2]In 1970, 13.9% of the children under 18 living with single parents (who had never married) lived with their single fathers as opposed to 9.2% in 1960. U. S. Bur. of the Census, 1 *U. S. Census of the Population* 1970, "Characteristics of the Population," Pt. 1, U. S. Summary-Sec. 2, Table 206 (1973) ; *id., U. S. Census of the Population* 1960, Table 185 (1963).

■ Accordingly, this court holds that the father cannot be denied custody by virtue of his status as an unwed father. *E. v. T., supra,* 124 *N. J. Super.* at 543. As stated by Judge Kentz in *R. v. F.,* 113 *N. J. Super.* at 408, "Once the putative father is determined to be the natural father and the duty of support attaches, he is no longer to be considered 'putative,' but simply the father."

## II. Termination of Parental Rights

■ It is against this background that the court must evaluate the father's rights under the adoption statute, *N. J. S. A.* 9:3–17 *et seq.,* for as noted earlier, the definitional section, *N. J. S. A.* 9:3–18(f), excludes the father of an illegitimate child from the legislative definition of "parent."

The issue embodies substantially more than the father's right to be heard. Of greater import is a determination of the standards by which the court is bound to evaluate his rights once he is before the court and has put his objection on record.

In light of the authorities noted above and the trend of the law granting unwed parents a status equal to that of wed parents, the standards enunciated by our Supreme Court in *In re Adoption of Children by D.,* 61 *N. J.* 89 (1972), suggest themselves as the most appropriate. Any other determination would invoke serious constitutional questions. *Stanley v. Illinois, supra.* And, although our Supreme Court in *D.* spoke of the divorced parents' situation, it has been said that there is no rational basis for not applying the prerequisites enunciated in *D.* to other situations. *In re Adoption of a Child by R. D.,* 127 *N. J. Super.* 311, 315 (App. Div. 1974).

In making this determination the court is not unmindful of the holding of *In re T.,* 95 *N. J. Super.* 228 (App. Div. 1967), where, according to the prevailing law, it was held that the consent of the natural father is not necessary if the parents were not yet married at the time the mother sur-

renders the child for adoption. While the trial court is bound to follow appellate authority, a review of the facts therein leads to the conclusion that it is not applicable to the instant case. In *T.* there was no proof that the natural father was identified or identifiable at the time of the mother's surrender of custody or at the termination of parental rights. *N. J. S. A.* 9:3–24. Additionally, the natural father there did not pose a constitutional argument, but rather argued that the effect of his subsequent marriage to the mother triggered a retroactive obligation to secure his consent. Moreover, the rationale of *T.* does not seem to have been followed in subsequent cases. *Stanley v. Illinois, Miller v. Miller* and *Sorentino,* all *supra.*

Here the natural father has had contact with his son since birth. The report of the guardian *ad litem* indicates that the child has benefited and would continue to benefit from a relationship with his father. If there is any reason why the "weighty incidents" of adoption that dictated the holding in *D.* are less compelling in this instance than in the situation where the rights of a wed parent are concerned, they are not apparent to this court. Indeed, the right to custody of the child would be a meaningless gesture in the absence of safeguards protecting a natural father against termination of parental rights based solely upon the best interests of the child test. As recently stated by the United States Supreme Court in *Weinberger v. Wiesenfeld,* 420 *U. S.* 636, 95 *S. Ct.* 1225, 43 *L. Ed.* 2d 514 (1975):

It is no less important for a child to be cared for by its * * * parent when that parent is male rather than female. And a father, no less than a mother, has a constitutionally protected right to the "companionship, care, custody and management" of "the children he has sired and raised, [which] undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley v. Illinois,* 405 *U. S.* 645, 651, 92 *S. Ct.* 1208, 1212, 31 *L. Ed.* 2d 551 (1972). [420 *U. S.* at 652, 95 *S. Ct.* at 1235]

In determining whether parental rights should be terminated, the only statutory standard pertinent here is

whether the natural father has forsaken parental obligations. *N. J. S. A.* 9:3–18(d); *N. J. S. A.* 9:3–24(*C*). Taking into consideration all of the evidence presented, including the reports of the Division of Youth and Family Services, the Probation Department and the guardian *ad litem*, the court concludes that B.'s father has not forsaken his parental obligations. In his relationship with B. as experienced there has been no "past course of conduct amounting to intended abandonment or very substantial neglect of both parental duties and claims." *In re Adoption of Children by D., supra,* 61 *N. J.* at 94. Accordingly, the petition for adoption must be denied in the absence of consent by the father.[3]

### III. Best Interest of B.

In so far as the custody of B. is concerned, other considerations are pertinent. The inherent distinctions between custody and adoption are well documented. *In re N.,* 96 *N. J. Super.* 415, 423 (App. Div. 1967), and it is clear that in custody matters "the paramount consideration of this and any other court is and should be the safety, happiness, physical, mental and moral welfare of the child." *Fantony v. Fantony,* 21 *N. J.* 525, 536 (1956); *Schwartz v. Schwartz,* 68 *N. J. Super.* 223 (App. Div. 1961). Stated differently, the all-inclusive test is the best interests of the child.

---

[3]Parenthetically, it should be noted that the court finds no other statutory bar to adoption by E. and R., notwithstanding the fact that they are divorced. Both bear the same degree of blood relationship to the adoptive child and both have continued to spend substantial time in a common setting with the child. While R. no longer resides in the home, he visits there daily and maintains a "presence" in the home. He has been contributing to B.'s support since his birth. While B.'s best interests would dictate that only one of the adoptive persons have custody, he could only benefit from the support and nurturance of both E. and R. Although there is no statutory provision covering this situation, it is elementary that in construing a statute the court will make inquiry into the true intention of the law and read it to effectuate its main purposes. *Wollen v. Fort Lee,* 27 *N. J.* 408, 418 (1958).

B. is seven years old. As noted above, he has lived with E. and the rest of his mother's family all of his life, except for a three-month period. He attends school in the community and does very well. It is clear that E. and R. stand as psychological parents to B. in every sense of the term. B. has a half-sister (having the same mother) from whom he has never been separated.

B.'s father is now married and lives in another community with his wife, whom B. hardly knows. His relationship with his father is a casual one, the natural result of irregular and infrequent contact. Although there was conflicting testimony concerning the father's access to B. for purposes of visitation, it is clear that the opportunity for more visits existed, particularly prior to the mother's death, but was not exercised.

The dilemma here is not susceptible of a facile solution. The considerations which compel the court to give due regard to the father's right to remain a parent do not obtain where custody over the child is the issue. As noted by the court in *Sorentino v. Family & Children's Society of Elizabeth, supra,* "*D., supra* [did not] hold that the right of custody over a child by a non-forsaking parent was necessarily inviolable as against a showing of the probability of serious harm to the child if such custody was awarded." 72 *N. J.* at 132.

The recent case of *S. M. v. S. J.,* 143 *N. J. Super.* 379 (Ch. Div. 1976), decided six months before *Sorentino,* dealt with similar considerations. There the court was faced with the issue of whether, in the absence of a showing that the natural parent was unfit or had forsaken parental obligations, the court has the right to award custody of a child to a stranger when it is in the child's best interests. The parents therein had been married for seven years. One of the three children had been born out of wedlock prior to the marriage — the husband before the court was not the father of the child. When the husband and wife separated, the wife retained custody for 1¾ years and then surrendered

custody to the husband, who had the children for two years prior to the commencement of the proceeding. After a consideration of the various authorities the court awarded custody to the husband, allowing liberal visitation to the wife, noting:

"Courts have traditionally been reluctant to deny a parent custody of his or her child." *In re Mrs. M., supra,* at 186 [74 *N. J. Super.* 178 (App. Div. 1962)]. They should remain so. But, when the best interests of the child will be clearly served by custody in someone other than the parent, a finding of abandonment by the parent, or parental unfitness, is not a prerequisite to a custody order. [at 385]

More is at stake here than a determination that B. would be "better off" in E.'s custody. While there is little doubt concerning the father's fitness as a parent, the court is extremely reluctant to dislodge B. from the only home environment he has ever known, particularly since he so recently experienced the loss of his mother. While the court cannot give much weight to B.'s own wishes, he expressed a desire to stay with his grandmother. B. is very much aware that he has a younger sister and award of custody to father would mean separation.

Based upon theories articulated by Goldstein, Freud and Solnit in their book, *Beyond the Best Interests of the Child* (1973), E. and R. persuasively argue that a removal of B. from his present home would be detrimental to his psychological well-being. The court is inclined to agree. In view of the strong arguments made by E. and R. in this regard, it was incumbent upon the father to come forward with evidence which would allay the court's concern with potential psychological injury to B. *Sorentino, supra* 72 *N. J.* at 132–133. No such evidence was forthcoming, despite notice to counsel that the issue had been raised. In light of the foregoing the court has determined to deny the father's petition for custody, and order custody of B. remain with E., his maternal grandmother. Father is to have liberal visitation rights.